## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MARK ARZOOMANIAN,                         :
                                          :
                                          :
                                          :
             Plaintiff,                   :        Civil Action No.  03-374 (PGS)
                                          :
        v.                                :            **OPINION**
                                          :
BRITISH TELECOMMUNICATIONS,               :
PLC.,                                     :
                                          :
           Defendant.                     :

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on a motion for summary judgment by British Telecommunications (BT) against plaintiff, Mark Arzoomanian.  Previously, another defendant, Unilever, was dismissed for lack of jurisdiction. Arzoomanian sues BT for a brokerage fee allegedly due and owing for  Arzoomanian's role in assisting BT land a communications deal with Unilever. Arzoomanian sues on several theories: tortious interference with contractual relations, tortious interference with prospective economic advantage and quantum meruit.

BT and Unilever are multinational companies which are headquartered in the United Kingdom. Since Unilever was a substantial customer of BT, BT assigned account representatives who were responsible for managing and servicing the Unilever account.  The BT employees in the United Kingdom who were responsible for the Unilever account were David Disley (primary decision maker), Roger Kitchen, Alexander Ove and Ian Price, as well as Anthony Maras who was

based in Minneapolis[1].  Sandra Rowe of Syntegra, a BT subsidiary, provided technical support as required[2].  Due to its global telecommunications requirements, Unilever established an internal working group which managed its voice, data and computer technology requirements, including internet capabilities called the Global Infrastructure Organization (GIO).  The GIO members in the United Kingdom were Martin Armitage (primary decision maker), Phil Hopley and John Lea. Eugene Goodmaster (a GIO member) and Peter Dove, a co-employee, were stationed in the United States.

Mark Arzoomanian, plaintiff, is the President of Starpoint, Inc., which provides software application assistance and staffing.   Arzoomanian met with Goodmaster (a GIO member) of Unilever North America in the summer of 2001. Thereafter, in January 2002, Starpoint and Unilever North America entered into a contract whereby Starpoint provided its software support services to Unilever in the United States.

As all multinational corporations, Unilever constantly strives to reduce costs. One area of concern was the worldwide cost of voice and data lines of which BT was a major supplier.  On or before December 7, 2001, Phil Hopley of Unilever's GIO group noted in an internal memo that one initiative of the GIO was to examine communication expenditures and to review "the option to subcontract whole or major part of our activity to a single supplier/integrator." The rationale was that by purchasing communication services and products in bulk,  savings could be achieved and better

---

[1]  Maras was an employee of Ignite US, a BT Subsidiary.

[2]  BT Ignite and BT Syntegra collectively form BT Global Services, one division of the BT Group.

managed[3].  At that time, Hopley recalled that BT was one of the suppliers that Unilever was considering to approach to bid on any cost saving initiative.  In the first quarter of 2002, there were various discussions between BT and Unilever executives regarding various network options for a supplier of "all global voice" communications.  (See, for example, Kitchen's (BT) e-mail to Ove dated February 26, 2002).  In fact, on March 18, 2002, BT withdrew from bidding on a voice over internet protocol (VOIP) proposal due to pricing; but offered computer based technologies as an alternative to Unilever.  Shortly thereafter, on or about March 29, 2002, BT received another request for a proposal (see Ove's (BT) e-mail to Lea (Unilever)).  Syntegra, a subsidiary of BT, was providing support and responding to the proposal (see Kitchen e-mail to Rowe dated March 29, 2002 and Price e-mail dated April 14, 2002).

At some point between December 2001 and April 30, 2002,  Arzoomanian met with Goodmaster (Unilever). During the meeting, Goodmaster explained Unilever's need to reduce telecommunication costs, especially in his particular area, North America. According to Goodmaster, Arzoomanian boasted that "he had contacts with telecommunications companies, and would get back to him."[4]  Shortly thereafter, Goodmaster was advised by headquarters that global negotiations were back on again and he should stop regional efforts.  According to Arzoomanian, Goodmaster stated that if he could find a supplier who could substantially reduce costs, Goodmaster would make certain that the supplier pays Arzoomanian.

---

[3]  This is the earliest mention of such an initiative.  Although BT claims it had met with Unilever to discuss same on a conceptual level in July, 2001.

[4]  Starpoint's contract (discussed earlier) is not related to the telecommunications initiatives of Unilever.

3

Meanwhile, during April, 2002, BT executives forged ahead on developing a global voice proposal to submit to Unilever. As with any proposal, there are pros and cons to bidding. Kitchen (BT) expressed concern about submitting a proposal because Unilever "had an offer . . . to reduce current (AT&T) minute costs by 35%; and the Syntegra/Unilever relationship could stand an improvement. As a result, it may be better to propose some type of more encompassing solution to overcome these obstacles". (see, e-mail Kitchen to Disley dated April 26 and 28, 2002).

At some point, at the end of April 2002, Arzoomanian contacted Anthony Maras (BT manager, in Minneapolis) about the Unilever telecommunications initiative. Maras had been previously unaware of the initiative[5]. Maras immediately contacted Kitchen in England regarding same.

Arzoomanian's involvement was brief, less than two weeks; but it set off a flurry of correspondence within BT. As discussed below, and taken as a whole, the e-mails concerning Arzoomanian's involvement in the BT/Unilever deal challenge his purported role.

On April 30, 2002, Kitchen (BT) becomes aware of Arzoomanian's entry in the scene. Kitchen expresses his skepticism in strong terms about Arzoomanian's role and/or authority to act as a broker on behalf of Unilever. In an e-mail to Disley, Kitchen writes:

> There are some strange developments . . . Over Friday evening / week-end I had a number of conversations with Terry Regan and Tony Maras of Ignite US. Terry put Mark [sic][6] in touch with "a consultant" who convinced Tony that he was in a position to broker a deal for an outsourcing contract with Unilever . . . it is all very cloak and dagger - no names, no numbers and the comment that if anybody

---

[5] According to Maras, it is doubtful whether Maras had corporate authority to bind BT (see Maras dep. 48-52).

[6] This is a typo. Kitchen is actually referring to Anthony Maras.

4

in Unilever heard of this arrangement at this stage it would not happen. Without closing the door completely my response to Tony was that I would continue with the plan to see what BT was prepared to put in writing to Phil Hopley, backed by whatever call plan we decided upon. I got a couple of calls from Tony late last night and finally had a three way call with the consultant. The gist of the conversation is:

- Unilever have had an "offer" to take over their voice and data infrastructure globally with savings of 35% - on a current spend of $200m pa

- The "consultant" has been approached by Unilever and given the opportunity to bring an alternative company with an improved offer

- He says this is going to happen and he is giving us the opportunity to win the business

- He is looking for something in writing stating that we are hugely interested - outlining our capabilities and a form of words around an offer with expected savings - in his words "the bottom line is 40%". - Tony told me 36% the other day.

I told him that in principle BT was very interested in outsourcing contracts of this size but that in my opinion nobody could put together a serious "offer" without the scope being defined and without consideration of existing contracts, penalties etc. He says he will look into the matter of existing contracts but that an offer is already on the table and we need to decide if we want to make a play or not - by Tuesday morning US time. Tony Maras is totally bullish about this and wanted us to put something together last night!! (Tab 52.)

\* \* \*

Facts - Unilever are interested in outsourcing their voice operation globally; They are collecting data for an RFP at this time . . .; Sandie Rowe [of Syntegra] tells us they have had 2 offers to take over all voice and deliver savings between 20% and 40%; Phil Hopley [Unilever UK] has approached me and Sandi Schilder [BT] to see if BT are (still) interested in putting in an offer; Phil Hopley has told me that if they get a suitable offer they will accept; The consultant Mark Arzoomanian e-mail address @starpoint.com; Starpoint is an IT outsourcing /resourcing /Systems Integration company.

5

\* \* \*

> Thought/possibilities - (1) The guy is on some kind of mind altering substances; (2) He has "happened" upon something and is looking to turn it into an opportunity; (3) He is making this approach to a number of people looking for the best deal / playing one off against another; (4) Someone in Unilever approached him and (3) still applies; (5) He is totally genuine and we shouldn't just ignore him.

Despite Kitchen's concerns about Arzoomanian's veracity and mental health status ("the guy is on some kind of mind altering substance"), Maras sends an e-mail to Kitchen seeking help, stating that plaintiff needs the "letter of intent by today" for delivery to Unilever. Thereafter, Maras forwards a document entitled Statement of Intent (SOI) through Arzoomanian to Unilever. The SOI does not address Arzoomanian's role. The SOI reads:

> BT has a significant interest in developing a formal partnership with Unilever that would entail the consumption of the complete operations of Unilever's Global Voice and Data network. Unilever has indicated that BT will need to offer a discount on their existing Global and Voice network, somewhere in the neighborhood of 35-40%. BT will do what is necessary to arrive at this negotiated price-point. However, the aforementioned statement of intent is subject to thorough due diligence and market conditions at the time of finalized terms and conditions and is subjected to analysis and approval by BT Finance. We would like to clearly communicate our major interest in pursuing this relationship with vigor coupled with fiduciary responsibility. As such we accept the challenge of meeting this discount structure. If it is financially feasible, we will get it done. BT is a Global service provider that can offer complete turnkey communications services utilizing the best communications services the world has to offer. BT has the ability to manage existing vendor contracts while transitioning business over to the BT platform regardless of the communication technology. To that extent, we can offer complete management of your Global Voice and Data networks.

> Your BT team will be dependent upon where Unilever would like their resources allocated. We can provide in-country account, bid, project, service, engineering and technical management to fulfill all of your needs. We can provide Unilever with a contract in any

6

> country using any currency in an effort to be flexible and sensitive to
> disparate in-country profit centers [sic].  If and when necessary, BT
> will use partners and third party vendors to fulfill technical
> requirements not covered under the BT footprint.  The contract and
> service, as a whole, would be completely managed by BT.

> Currently, I am the Account Director for Unilever in the United States
> whilst Roger Kitchen has duties in the U.K.  Again, your account
> structure is subject to change based on the needs and demands of a
> future negotiated contract.  We look forward to working with your
> company going forward and commit to put the entire resource of BT
> behind our offering.

As noted above, nothing in the SOI clarifies Arzoomanian's role and/or by whom he has been

retained, if anybody.  Nor are there precise terms for going forward with Unilever.

Upon receipt of the SOI by Unilever, its executives reacted negatively.  They found the SOI

vague, and thereafter accepted a proposal from a competitor of BT, T-Systems.  More specifically,

Arzoomanian e-mails Hopley (Unilever UK) on May 1, 2002.  It reads:

> As per my conversation with Gene Goodmaster, I am forwarding you
> this e-mail to further explain the scope of the deal structure I am
> pursuing with British Telecom and Unilever . . .

Also on May 1, 2002, Hopley forwards Arzoomanian's e-mail to Armitage and Lea (GIO members).

According to Hopley, the proposal "is vague about both intent and timing."  He continues with "I

suggest we continue with T-Systems and only follow this if we have worries about their offer.

Agree?" Armitage responded "Agreed."  This decision was not immediately communicated to BT

executives.  As a result, BT continued to hone its proposal.

Simultaneously with Unilever's deliberations of the SOI, Arzoomanian must have learned

that Unilever was underwhelmed by BT's SOI, and Arzoomanian requested BT, through Maras, to

send a more definite Letter of Intent (LOI)[7]. In fact, Kitchen (BT) drafted a LOI and circulated it internally. After internal discussions, BT decided not to send the LOI to Unilever or Arzoomanian. Maras (BT Minneapolis) commented on the draft. He indicated that "we [BT] must address the issue of Mark's compensation." (e-mail from Maras to Kitchen dated May 2, 2002). Up until this e-mail it appears that BT believed Unilever was responsible for Arzoomanian's compensation.

On May 2, 2002, Disley (BT-UK) wrote to Tom McLoughlin (BT-UK), an attorney, regarding "the Unilever consultant", Arzoomanian. Disley recognized that a "potential fly in the ointment" is plaintiff's commission payment and that Arzoomanian "would like to agree with us before introducing us" to his Unilever contacts.

On May 3, 2002, Kitchen e-mailed Sandra Rowe of Syntegra requesting assistance and insight into the legitimacy of Arzoomanian's authority, his alleged role as a "consultant" and his alleged contacts with the Unilever board members, in addition to GIO members like Hopley. Kitchen expressed numerous concerns including the ethics of a relationship with Arzoomanian. Kitchen wrote:

> To cut a long story short we reached the point of putting in a very positive response (not quite an offer - subject to due diligence etc) when the consultants fees were brought in to the equation. Up to that time we [BT] assumed that he [Arzoomanian] had negotiated fee / commission with Unilever in return for higher than expected savings. From an ethical, corporate governance, legalistic and professional point of view this will be a show stopper for us - we do not know if he is representing both parties in the same "deal", certainly can't see how he can be representing Unilever best interests when his own are tied so closely to the "supplier".
>
> He obviously therefore will not act as the interface for our offer (we have had no other, official, approach for both voice and data) and

---

[7] The LOI and SOI are different documents.

worse suggests an ability to "kill" the deal due to the strength of the relationship he has at board level should we try to go direct. He has by the way indicated that Phil Hopley is fully in the picture and has had sight of an initial e-mail response we put in to the consultant.

Having gone so far we are not prepared so simply walk away...A[n]... option is an approach at plc[8] board level - the only reason being that they seem to be involved already (if we can believe what we are being told).

I know this is difficult and sensitive but hoped you might be able to give some insight on the likelihood of a plc board member investigating this type of deal, which would clearly normally be a GIO role, and if so the likelihood of Phil (and I guess I mean Martin too) being kept in the picture (as the consultant suggests).

On May 4, 2002, Disley e-mails Maras (copying Kitchen) with regard to the proposed LOI for Arzoomanian.    In the e-mail Disley addresses Arzoomanian's role, and espouses that his compensation must be negotiated with Unilever:

I am very conscious that Mark [Arzoomanian] needs to find a way to be paid for this deal and would like to seek a commitment to greater savings.   We also have a responsibility to ensure that we are professional and can deliver a deal that is sustainable for BT and Unilever . . . It is not our intention to try and cut Mark out of this....It can't be beyond our capabilities for BT, Unilever and Mark to sit down and agree the reward model - there are plenty of examples where fees have been paid by clients on the basis of a share of savings . . .

In response, Maras replied to Disley (copying Kitchen) by e-mail dated May 4, 2002. Maras insisted that Arzoomanian had an agreement with Unilever and that, in his view, solves the problem.  He wrote, in pertinent part:

Unilever and Mark Arzoomanian's company have entered into a formal agreement placing him in power for this negotiation.  The

---

[8] A PLC is an acronym for Public Limited Company.  In the UK, this is a type of corporate structure whose shares may be sold to the public.  Both BT and Unilever are PLC's.

> contract from Unilever will state that all negotiations will go through his group with its' associated fees. This means that in order to do business with Unilever, we have to pay Mark's group[9]. This should remove any issues surrounding the fact that it has the allure of being 'dirty' and should also remove the constraints regarding the 'corporate government' legality issue. It is just part of the deal. A similar analogy might be if BT outsourced their recruiting to a specific firm; it would be nonsense to assume that a company would refuse to do business with BT because they had to go through the firm to get to BT. Another analogy might be if you were to sell your house and enlist the services of a realtor. As a buyer who wanted the house, would you not make an offer because you refused to deal with a realtor? This is just the way Unilever has chosen to do business in this case . . .

The bickering within BT continued. Kitchen was not convinced that Maras' comments were correct, and he critiqued Maras' memo to Disley. He stated:

> Interesting thoughts but I wouldn't expect to have to pay the recruiting firm to get interviews and every time I've bought a house it's been their client who has paid the realtor not me. I certainly wouldn't pay said realtor to pass on my offer!! Even if we accepted that the deal works the way proposed the figures look ridiculous . . ."

The internal BT discussion of Arzoomanian's role, if any, carried over to May 4, 2002. In another e-mail from Disley, he updated BT personnel and sought comments on a proposal to Unilever. Disley expressed concern about Arzoomanian's role. Disley points out that (1) Arzoomanian alleged that he has a deal with Unilever wherein the supplier like BT would pay his fee; (2) BT requested some written assurance of Unilever confirming Arzoomanian's role; (3) and if such authority were provided then it must be negotiated with Unilever. Disley commented:

---

[9] The May 4, 2002 e-mail uses the phrase "Mark's group" twice and the term "Mark's company", referring to Starpoint, the corporate entity of which Arzoomanian is a principal. Accordingly, the question arises whether Arzoomanian or Starpoint is proper plaintiff. This further shows the indefinite nature of the relationship among Unilever, Arzoomanian and BT.

> The consultant is claiming that he has authority from Unilever to do this deal and that Unilever has agreed in writing that the vendor can pay his fees. He is in contact with Phil Hopley of Unilever who is awaiting our offer (via the consultant) over this weekend. He [Arzoomanian] is adamant that any direct approach to Phil Hopley will result in our deal failing. We have asked the consultant for a copy of the authority from Unilever which he will send across today/tomorrow. This will at least confirm his credibility . . . I still have a preference for agreeing [sic] the fee and how [sic] is paid in open debate with Unilever and for that fee to be paid by Unilever. I would like all to be on standby on Tuesday for a potential conversation directly with Unilever regarding the deal as I suspect that we will have been unable to reach agreement with the consultant by then and will effectively be in competition with him.

In a May 5, 2002 e-mail to Disley, Kitchen acknowledges that BT was pursuing multiple "strands" or offers on their own and through the "consultant" - they pursued both a global voice deal and a voice and data deal.

As of May 6, 2002, there was still no clarity as to Arzoomanian's authority to act on behalf of Unilever, or the veracity of Arzoomanian's statements to BT regarding his authority and that he had contacts on Unilever's board. On that date, Kitchen corresponds with Disley. Kitchen queries:

> Consultant - are we prepared to work through him or not - assuming for the moment that he comes up with the letter [of authority] from Unilever....The board level contact is key here Mark Arzoomanian seems to have it (letter should prove/disprove) and we don't - (no good saying we should we just don't). Any other approach will ultimately end up at the board for a decision.

In another memo from Kitchen to Sandra Rowe, Kitchen acknowledges that BT is awaiting a letter of authority from Unilever about Arzoomanian, and Arzoomanian's threat that BT should not end run him because of his relationship with Unilever board members. Kitchen writes:

> It seems clear now that Phil Hopley is very much in the picture. He has - we are told - been tasked to manage this by a plc board member. In your view is it conceivable that Martin Armitage could be unaware

11

of this?  One major difficulty which we have is that the consultant is looking for a very large fee - and that can only come out of any savings we could achieve.  This means that we might be able to make a much more attractive offer to Unilever direct - if we chose (but as you might expect we have had dire warnings of the consequences of attempting this).  By the way when I sent the e-mail below it looked as though our discussions with the consultant had ended but in fact they are still alive and we are waiting for a letter from Unilever (via the consultant) stating that he has authority to act for them in this regard.

On May 7, 2002, Kitchen e-mailed Disley with the subject line "Outsource voice and data - the true story?"  The e-mail clarifies Arzoomanian's role with Unilever at that time. Lea, Procurement Director for Unilever GIO, confirms to Kitchen that (a) Unilever was interested in an offer from BT for their global voice and data needs; (b) Unilever was **not** interested in using a third party (referring to Arzoomanian); (c) A third party (Arzoomanian) had contacted Unilever about an approach suggesting a 40% savings (35% savings for Unilever and 5% commission) that named BT as the provider (which BT never authorized); and (d) Lea said that no written confirmation from Unilever would be forthcoming regarding use of the consultant. The memo read:

> Dave
> I've just been speaking with Jon Lea, Procurement Director Unilever GIO ES.  Unilever are [sic] interested in hearing an offer from us for their global voice and data.  They are **not** interested in using a 3rd party.  Jon says they have received an approach from a 3rd party suggesting that savings of 40% can be made and that his commission will be 5% leaving 35% for Unilever.  Jon says that the 3rd party has named BT (but possibly they have that from Sandra Rowe).  I talked through the approach we had received and said we had expressed interest but had told the consultant we needed written confirmation from Unilever that they wished to proceed in this way and that he had authority to act on their behalf.  I also told him that we couldn't see any benefit to Unilever in this type of arrangement - neither can they.  Jon tells me that the letter will not be forthcoming.  However Unilever have [sic] received at least one offer.  It is in 2 stages.  Stage 1: Transmission networks, lines, calls mobiles.  Stage

12

> 2 people and assets. Structured this way as stage 2 is more difficult
> to assess. Jon talked about a 3 and 5 year option both offering
> savings over the contract term and both specifying the level of
> savings this fiscal. Figures involved are: voice 84 m euros : data :
> 56m euros. Needs to know how much of any offer is achieved by
> price variance and how much by other means.
> Roger

Also on May 7, Kitchen e-mailed several BT co-workers to discuss his conversation with Lea

of Unilever. Kitchen stated that: "Jon is aware of the approach we received from a third party in

the US....The GIO would prefer to deal direct rather than through a 3rd party."

On May 8, 2002 Kitchen followed-up about a phone conversation with Lea. Kitchen raised

the issue of Arzoomanian and BT's request for written proof from Unilever of plaintiff's authority

to act on Unilever's behalf. The email stated:

> Further to our conversation today. Confirmation that we are very
> interested in working with Unilever on the above project. For
> background. We were contacted a few days ago in the US by a third
> party who stated that he had been approached by Unilever to work on
> their behalf with regard to the outsourcing of their entire voice and
> data services, inclusive of people and assets. He indicated that
> Unilever had a target figure of a 35% reduction in spend [sic] over a
> 5 year contact [sic] term based on current costs of $200m p.a. I
> believe you have seen our initial response and, as you are aware, we
> required written proof that the consultant had been authorized to act
> on your behalf before we could take the matter any further.
>
> Clearly we are interested in working with Unilever on a project of this
> nature, and, particularly in the current financial situation, BT is better
> placed than most to work as a long term partner to help you achieve
> your financial and business aims . . .

Kitchen sent a follow-up e-mail to Disley on May 9, 2002, memorializing a conversation he

had with Arzoomanian. According to the e-mail, Arzoomanian provided three names from Unilever

North America of persons that Kitchen should call to allegedly confirm the deal. Kitchen wrote:

13

> I declined and said that I couldn't do that . . . .I told him that the view
> at this end was obviously clouded by events on Tuesday when we
> were told that Unilever was not interested in working through a third
> party.

On May 10, 2002, Kitchen wrote to Arzoomanian as follow-up to their phone conversation

and Kitchen's conversations with Unilever UK decision makers (memorialized in the May 9, 2002

e-mail):

> I have this morning been advised, by Unilever, that the only people
> with any authority, in the area you approached us about, are in the UK
> and that any company with any interest whatsoever in this opportunity
> should work through the specified channel. It was made very clear to
> me that no other approach will be considered. We have all put a great
> deal of effort into this and I am anxious not to take up any more of
> your time when in the circumstances BT has no alternative but to
> withdraw from our discussions. I am very sorry that we have not
> been able to take this further and wish you all the best for the future.

Also on May 10, 2002, Kitchen corresponded with Maras explaining all that he learned about

Arzoomanian and that Kitchen had "no alternative other than to withdraw from discussions with

[Arzoomanian]; but acknowledged there could be some fall out. "Wait for the explosion now I guess

- I just hope he doesn't ring Tom[10] now that he has nothing to lose."

Maras e-mailed Kitchen on May 14, 2002, looking for any updates on a deal between BT and

Unilever, and recounted a conversation had with Arzoomanian:

> I spoke with Mark Ar. in which he gracefully wished us luck, but was
> not pleased by the fact that he brought us into this opportunity and has
> been seemingly cut out of the deal. At least BT is now in the position
> to negotiate directly with Unilever for the entire Global spend, a
> unique position we had never been [sic] up until this point.

After Arzoomanian was out of the picture, BT did not immediately secure a contract. In fact, there

---

[10]  It is unclear who "Tom" is.

14

were several false starts over a six month period. For example, on May 26, 2002 a "Stop/Go Update" briefing, by John Hunter of BT-UK, was published that detailed Unilever's disappointment with BT's lack of firm commitment to the proposal submitted. It found that BT was slow, unresponsive, not hungry for this business and more expensive than their competitors. In addition, BT had been invited to bid for Unilever's international voice business previously, and BT declined.

An e-mail was sent from Julia Worthington, Bid Manager for BT-UK, on May 27, 2002, to several people at BT and its subsidiaries regarding BT's decision to "NO BID" a Unilever Global Outsourcing Opportunity request for proposal. The reasons BT did not bid were that: (a) BT could not commit to the savings desired at that time; (b) there was doubt whether BT could match the savings that their competitor had promised; (c) BT would be expected to cut costs in the future as well, which would make it unlikely that they could re-coup any losses incurred on this bid; and (d) returning to Unilever with a vague proposal would damage any potential to build on the BT-Unilever existing relationship. Despite those concerns, between June and September of 2002 there were a series of proposed offerings, rejections and/or no-bids between Unilever and BT.

On July 1, 2002 a letter was sent to Armitage (Unilever GIO member) from Humphrey Penney, BT Director of Corporate and International Solutions, with yet another BT proposal for global telephone. By way of e-mail later that day, Lea, on behalf of Armitage, rejected the BT proposal. While Unilever was less than enamored by BT's response, Unilever had also failed to successfully negotiate a deal with other suppliers. Hence, on September 9, 2002, an internal memo among BT personnel described a new effort to propose a deal with Unilever in light of those failed negotiations.

Finally, in November, 2002, BT and Unilever entered a contract for global voice and data

communications. This deal is consistent with an unsolicited proposal BT made in November, 2001. It is noteworthy that a press release announcing the agreement discusses how the deal relates back as far as June 2000 and July 2001 (*See also*, e-mail from Andrew Housden of BT-UK, to Disley, Kitchen, Hunter and McLoughlin, dated September 22, 2002).

## II.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). Summary judgment is warranted if the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. *Team Resources, Inc. v. Exodus Communications, Inc.*, 60 Fed. Appx. 899, 902 (3d Cir. 2003).

## III.

Plaintiff claims that BT has tortiously interfered with its contractual relations. Under New Jersey law, to establish a claim for tortious interference with contractual relations, a party must prove, among other things, actual interference with a contract and malice. *Fainsbert v. Cuthbert*, Slip

16

Copy, 2006 WL 2096057 at *5 (D.N.J. July 27, 2006) (citing *Cox v. Simon*, 278 N.J. Super. 419, 432, 651 A.2d 476, 483 (App.Div.1995)). "An individual acts with malice when he or she intentionally commits a wrong without excuse or justification." *Id.* Moreover, a party's conduct is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Dello Russo, M.D. v. Nagel*, 358 N.J. Super. 254, 268, 817 A.2d 426, 434 (App.Div.2003). "However, the fact that a breaching party acted to advance [its] own interest and financial position does not establish the necessary malice or wrongful conduct ." *Id. Napolitano v. BAE Systems North America, Inc.*, 2005 WL 1703193 at 4 (D.N.J. July 20, 2005). *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-53, 563 A.2d 31, 37-38 (1989).

According to the e-mails from Maras to BT personnel in the United Kingdom, plaintiff represented he had a contractual relationship with Unilever[11]. Although a contract need not be in writing, in an action to recover damages based on tortious interference with a contract, plaintiff must prove that the elements of a contract existed between Unilever and plaintiff. That is, mutual assent, consideration, legality of object and capacity of the parties. *Duffy v. Charles Schwab & Co., Inc.*, 2001 WL 1104689 at *5 (D.N.J., Sept. 4, 2001) (citing *Nadel v. Play-By-Play Novelties, Inc.*, 208 F.3d 368, 378 (2d Cir. 2000)). There must be a "meeting of the minds," as evidenced by each side's express agreement to every term of the contract. *State v. Ernst & Young, LLP*, 386 N.J. Super. 600, 612 (App. Div. 2006); *See, Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526, 538-39 (1953). There was no such meeting of the minds between plaintiff and Unilever in the instant matter.

---

[11] As mentioned earlier, Starpoint had a written contract to provide software support services and staffing to Unilever. Starpoint is controlled by Arzoomanian. This contract is not in dispute here.

17

Plaintiff relies upon the "go-ahead" he allegedly received from Goodmaster at a luncheon in late April, 2002. (Plaintiff's Opp. at p. 7). However, plaintiff conceded that "Goodmaster indicated that he and the GIO would be 'more than happy to entertain' such an offer. (*Id.*). Thus, at best, plaintiff possessed an opportunity to enter a contract with Unilever and present an offer, but none of the basic contract elements to establish a contractual relationship were argued or established, let alone any specific meeting of the minds. The Court finds there was no contract between Unilever and Arzoomanian and as a result, plaintiff can not prove any interference with a contractual relationship. *Dello Russo, M.D. v. Nagel*, 358 N.J. Super. 254, 268, 817 A.2d 426, 434 (App.Div.2003).

Plaintiff points to the Statement of Intent ("SOI") dated April 30, 2002 to establish that some agreement or contract in fact existed between Unilever and Arzoomanian. But this does not comport with the facts. The SOI was between BT and Unilever. It does not mention plaintiff. Plaintiff's claim as to tortious interference with contractual relations is dismissed because there is no underlying contract between Unilever and Arzoomanian and thus no issue of genuine material fact as to that count. *Napolitano v. BAE Systems North America, Inc.*, 2005 WL 1703193 at 4 (D.N.J. July 20, 2005); *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-53, 563 A.2d 31, 37-38 (1989).

At best, plaintiff has an illusory promise or contract. "An illusory contract is an agreement in which one party gives consideration that is so insignificant that an actual obligation cannot be imposed." *Woll v. United States*, 45 Fed.Cl. 475, 478 (1999); 1 S. Williston, A Treatise on the Law of Contracts s 104 (3d ed. 1957). According to Corbin:

> If what appears to be a promise is an illusion, there is no promise; like the mirage of the desert with its vision of flowing water which yet lets the traveler die of thirst, there is nothing there. By the phrase "illusory

> promise" is meant words in promissory form that promise nothing;
> they do not purport to put any limitation on the freedom of the alleged
> promisor, but leave his future action subject to his own future will,
> just as it would have been had he said no words at all.

*Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 769 (Ct.Cl., 1982) (quoting 1 Corbin on

Contracts s 145 (1963)). Goodmaster's comment to Arzoomanian that if Arzoomanian finds a

supplier that will save Unilever significant monies, then he will see to it that the supplier will pay

Arzoomanian, is an illusory contract. There is no term, no compensation, and the parties are not

even identified.

Assuming there was a contract between Unilever and Arzoomanian, the claim would still be

dismissed because Arzoomanian must prove that BT's actions were intentional and malicious. The

correspondence in early May, 2002 established that BT questioned Arzoomanian's authority. It

appears to this Court, BT executives had an affirmative fiduciary obligation to the corporation to

flesh out Arzoomanian's role. A corporation acting in its own self interest is not sufficient to

establish interference. For BT to request Arzoomanian to present a letter of authority from Unilever

is not interference; it is prudent decision making. See, *Dello Russo, M.D. v. Nagel*, 358 N.J. Super.

at 268.

## IV.

Under New Jersey law, the prima facie elements of tortious interference with prospective

economic advantage include: (1) a plaintiff's existing or reasonable expectation of economic

advantage or benefit; (2) a defendant's knowledge of the plaintiff's expectancy; (3) wrongful and

intentional interference with that expectancy by the defendant; (4) a reasonable probability that the

plaintiff would have received the anticipated economic advantage absent such interference; and (5)

damages resulting from the defendant's interference. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993); *Team Resources, Inc. v. Exodus Communications, Inc.*, 60 Fed. Appx. 899, 902 (3d Cir. 2003); *Harper-Lawrence, Inc. v. United Merchants and Mfrs., Inc.*, 261 N.J. Super 554, 619 A.2d 623, 639 (App. Div. 1993). To show wrongful and intentional interference, Arzoomanian must show that the defendant's conduct was "both injurious and transgressive of generally accepted standards of common morality or of law." *Id.* Thus, whether conduct constitutes tortious interference with prospective economic advantage depends on whether the conduct is "sanctioned by the rules of the game." *Id.* In this case, plaintiff became involved in late April, 2002. Upon learning of his involvement, a BT executive (Kitchen) mused that plaintiff must be "on some mind altering substance." And then, when BT learned Arzoomanian wished to be paid by it, BT sought assurances from Unilever that Arzoomanian had authority to act on behalf of Unilever. No confirmation of same was given by Unilever. Further, BT questioned the business ethics of paying a consultant who may be representing both sides of a transaction. (May 3, 2002 e-mail). Such questions by BT managers in analyzing the potential relationship, and such steps as confirming Arzoomanian's authority from Unilever are not the type of actions which support a claim for tortious interference with economic advantage. If anyone did not act appropriately, it is Arzoomanian. He enticed BT executives to act through him by making misleading statements. Most notably that he had critical board level relationships at Unilever which was not the case (May 3, 2002 e-mail). In any event, there is no proof that BT acted in a manner that was "both injurious and transgressive of generally accepted standards of common morality or of law."        Intentional interference with prospective business relations "protects the right to pursue one's business free from undue influence or molestation." *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-53, 563

A.2d 31, 37-38 (1989).   What is actionable is the "luring away, by devious, improper and unrighteous means of the customer of another even if no enforceable contract exists." *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582 (E. & A. 1934); *United Hatters, Local 17*, 73 N. J. L. 729, 743 (E & A 1906). One who unlawfully interferes with the interest will be held liable for the damage sustained by the victim of that interference. *R.A. Intile Realty Co., Inc. v. Raho*, 259 N.J.Super. 438, 476, 614 A.2d 167, 187 (citing *Harris v. Perl*, 41 N.J. 455, 462 (1964); *Mayflower Industries v. Thor Corp.*, 15 N.J.Super. 139, 83 A.2d 246 (Ch.Div.1951), *aff'd o.b.* 9 N.J. 605 (1952)). There must be proof not only of the unlawful, intentional interference with the prospect of reasonable expectation of economic advantage, but also proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits. *Myers v. Arcadio, Inc.*, 73 N.J.Super. 493, 498 (App.Div.1962). Furthermore, one commentator has noted that the opinions of the courts are replete with such expressions as "wanton interference", "wrongful interference", "molestation", "unjustifiable and malicious", in describing the conduct necessary to prove this tort. Here again, as in a case of inducing a breach of contract, intentional interference with another's efforts to enter into a profitable contractual relation is not actionable unless it falls within the area of socially unacceptable conduct. *See, Harper, James and Gray, The Law of Torts* 2d ed. Vol 2 §6.11 at 343 (Little Brown & Co. 1986).

There must be a showing by plaintiff of both interference by defendant and that the conduct of the defendant was unconscionable. That is, that such conduct transgressed generally accepted standards of morality. *McLaughlin v. Weichert Co. Realtors*, 526 A.2d 1119, 1121 (App. Div. 1987). There is no showing that defendants did anything other than taking reasonably prudent actions in furtherance of their corporate obligations, i.e. confirm Arzoomanian's role with Unilever.

21

A *sine qua non* of interference with contractual relations or prospective economic advantage is that the interference be unreasonable. *Glasofer Motors v. Osterlund, Inc.*, 433 A.2d 780, 791 (App. Div. 1981) (citing Prosser, Torts (4 ed. 1971), s 129 at 927; *Harris v. Perl*, 41 N.J. 455, 461 (1964)). Arzoomanian has failed to prove that the conduct complained of was either unlawful or unreasonable. Upon confirmation that plaintiff had no authority to broker a deal for Unilever, Arzoomanian's involvement with BT was promptly terminated. The case law in New Jersey is similar.

In *Printing-Mart-Morristown*, Sharp had a policy that stated "whenever printing is being done by a source other than Printing Mart (for items beyond their capabilities) several estimates" must be obtained. *Id.* at 747. Certain employees of Sharp together with principals of another company, Laurriett, "rigged" certain bids for printing so that Printing Mart could not bid even though it was qualified. *Id.* at 747. There was collusion between an employee of Sharp and an employee of Laurriet to derail Printing-Mart's efforts to bid on a specific job despite Printing-Mart's long standing and ongoing relationship with Sharp, and Sharp's directive. The Court held that in a claim for tortious interference with economic advantage, the ultimate inquiry is whether the conduct complained of "was both injurious and transgressive of generally accepted standards of common morality or of law." *Id.* at 757. The rigging of the bid and the collusion between the employees of Sharp and Laurriet was sufficient to present the issue to the jury. In this case, there is no proof that type of conduct by BT occurred.

In another case, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993), plaintiff was a franchiser of a ten-minute oil change business. Lightning negotiated with Witco to provide oil to all its franchisees as well as to certain capital equipment. Immediately after execution

of the contract, Witco poorly performed. Since the lack of performance by Witco caused severe issues with franchisees, many franchisees declared Lightning in default of their obligations. Ultimately these issues forced Lightning out of business. Lightning brought an action for tortious interference with prospective economic advantage against Witco on the basis that Witco deliberately undermined Lightning's relationship with its present and future franchises. At trial, Lightning proved that Witco knowingly invested in the same business as Lightning with a third party. In addition, Lightening showed that Witco obtained confidential information about Lightening's franchisees which Witco used in developing its venture and that Witco purposely did not perform in order to undermine Lightning's position with its franchisees. In this case, plaintiff argues that it has met the proof required as demonstrated by some of the remarks of BT executives who called Arzoomanian a "fly in the ointment." Such assertions simply do not rise to the level of proof necessary, as shown in *Lightning* where Witco muscled Lightning's franchisees in disrupting operations by failing to install certain equipment and provide oil as required.

In addition to the above, there is a line of cases which deal with brokers, and when a broker is entitled to earn a commission. Generally, a broker[12] is entitled to a commission if the broker was "the efficient producing cause of the sale." *See, Vanguard Telecommunications, Inc. v. Southern New*

---

[12] At argument, plaintiff likened Arzoomanian's efforts to those of a real estate broker. The comparison is in some senses incorrect. Real estate brokers are governed by the Real Estate Broker's Act. N.J.S.A. 45:15-1, et seq. *See, Kazmer-Standish Consultants, Inc. v. Schoeffel Industries Corp.*, 89 N.J. 286 (1982) (wherein Justice Pollack distinguished between business brokers and real estate brokers). In addition, advertisements for sale of real estate often include the phrase "brokers protected." This term "has a common and accepted meaning . . . that the seller will pay a commission . . . to any broker who produces a buyer." *National Newark & Essex Bank v. Housing Authority of Newark*, 75 N.J. 497, 504 (1978). In this case, Arzoomanian has no statutorily protected right nor can he rely on customarily used language like "brokers protected".

*England Telephone Co.*, 900 F.2d 645, 651 (3d Cir. 1990). *Vanguard* is instructive. Vanguard brought suit against SNET and other defendants for a breach of a brokerage commission. SNET and CSX formed a joint venture called Lightnet to establish and construct a fiber optic network along CSX's railroad right of way. Lightnet hired La Blanc as marketing consultants. Vanguard is a reseller which purchases capacity in bulk and resells it in smaller quantities. Vanguard and La Blanc commenced negotiations of a deal. There were a series of letters which set forth the terms of the contract. Vanguard would market Lightnet fiber optics to companies enumerated on an account list. Vanguard would be paid 2% commission on its sales; however, Lightnet would "take control of the account list". To Lightnet, the language that it would "take control of the account list" meant it would select and authorize those accounts on which Vanguard could work. Evidently, during negotiations of the business relationship, Lightnet became concerned that Vanguard would not produce any business as anticipated and accordingly it wished to reserve the right to market to anyone except those specifically authorized. Lightnet subsequently sold $115 million in capacity to United Telecommunications and over $1 million to Americall. Both companies were on Vanguard's account list, and Vanguard claimed a commission was due, even though it did not do any work to secure the deal.

The Third Circuit applied New Jersey law. It stated that when a brokerage contract is silent to the services required, the law presumes "a commission will be earned only if the broker was the efficient producing cause of the sale." Id. at 61. In looking at the writings which constituted the agreement, the Third Circuit found that there was nothing that supported Vanguard's position that a commission would be due, even if it did nothing to secure the sale. Hence, the Circuit upheld the district court's grant of summary judgment dismissing the complaint.

In this case, there is no writing between BT and Arzoomanian, and there were no terms negotiated. To say Arzoomanian was the "efficient producing cause" of the sale does not stand up to the facts. BT and Unilever had a long term, ongoing relationship before Arzoomanian ever appeared on the scene. BT had been reviewing various requests for proposals from Unilever that it had independently received, and the specific proposal on which Arzoomanian's claim is based was rejected by Unilever. The fruitful negotiation between Unilever and BT occurred months later after negotiations with other bidders collapsed. Hence, the lack of any understanding between BT and Arzoomanian (written or oral) and the lack of temporal proximity between Arzoomanian's interloping and the actual BT/Unilever deal show that Arzoomanian was not the "efficient producing cause."

In another case, *Inventive Music Ltd. v. Cohen*, 617 F.2d. 29, 32 (3d Cir. 1980), the Third Circuit reversed the District Court's granting of a directed verdict in favor of defendants. In that case, plaintiff sued to recover a finder's fee for his part in the sale of a record company. *Inventive*, 617 F.2d at 31-32. The broker had received a letter from the record company's lawyer stating not to actively pursue a buyer; but if you find a possible buyer, the company will pay a fee. The eventual buyer was contacted by the broker. At some point during negotiations, the buyer wrote to the seller indicating that an employee of the buyer had been investigating a possible deal with the seller, prior to the brokers involvement and the buyer wished to negotiate directly. Once informed, the broker protested, and wrote to the seller recounting his efforts. The seller's lawyer, in turn, presented the broker's letter to the buyer, and acknowledged that "the brokers facts were far different than presented by buyer." After hearing the evidence, the trial court dismissed the claim of the broker. The appellate division reversed primarily because it was a question of fact as to whether the broker

25

was the primary cause for the sale. Unlike *Inventive*, where the broker received a letter from the lawyer of the seller protecting the broker's position, Arzoomanian has no writing from either BT or Unilever. The Third Circuit recognized that in New Jersey, to earn a commission plaintiff must establish that he was the "efficient producing cause" in bringing about the sale at least in the sense of causing the seller to negotiate with a customer produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations. *Id.* at 32.

In this case, none of these elements are present. BT and Unilever had an ongoing relationship, and there was a solid break between Arzoomanian's involvement and the date of the final deal. Despite the contentions in his brief, plaintiff's "pre-existing relationship" with Unilever GIO was not the "efficient producing cause" of the BT-Unilever November 2002 deal. His Unilever contacts were limited to two United States-based individuals on the GIO, who admittedly could not bind the UK entity. He also was socially acquainted with two members of the boards of directors for Unilever North America who had no influence over this matter, and are merely mentioned in a footnote in plaintiff's brief. Plaintiff had no UK contacts sufficient to "spark" this deal. In short, there is no legitimate question of fact for the jury to entertain.

### V.

Plaintiff makes a claim under the theories of *quantum meruit* and quasi-contract. That is, plaintiff claims that BT received a benefit from plaintiff's efforts, and that plaintiff had a reasonable expectation of remuneration. New Jersey courts have held that "[i]n order to state a claim in *quantum meruit*, the plaintiff must assert: the performance of services in good faith; the acceptance for those services by the entity to which they were rendered; an expectation of compensation

therefor; and the reasonable value of the services." *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 172 N.J. 60, 68, 796 A.2d 238, 242-43 (2002); *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, n. 60 (D.N.J.,1999) (citing *Kopin v. Orange Prods., Inc.*, 297 N.J.Super. 353, 367-68, 688 A.2d 130 (App.Div.1997).

A quasi-contract will be recognized in appropriate circumstances, even though no intention of the parties to bind themselves contractually can be discerned. *Kopin*, 688 A.2d at 136. A plaintiff presents a successful quasi-contract claim if he can demonstrate "that defendant received a benefit from plaintiff which it is unjust for defendant to retain without compensation, and that plaintiff, in conferring the benefit, expected remuneration." *Id.* at 137 (quoting *Cohen v. Home Ins. Co.*, 230 N.J. Super. 72, 82, 552 A.2d 654 (App. Div. 1989)). *Quantum meruit* is a form of quasi-contract that enables the performing party to recover the reasonable value of the services rendered. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 437-38, 608 A.2d 280 (1992). In *quantum meruit* "it is well settled that where one performs services for another at his request, but without any agreement or understanding as to wages or remuneration, the law implies a promise on the part of the party requesting the services to pay a just and reasonable compensation." *Kopin*, 79 N.J.L. 326(quoting *Conklin v. Kruger*, 79 N.J.L. 326, 328, 75 A. 436 (Sup. Ct. 1910)). The key *quantum meruit* element as it relates to this case is the acceptance of the services by the person to whom they are rendered. *See, Gould v. American Water Works Serv. Co.*, 52 N.J. 226, 230-31 (1968). The evidence is uncontradicted that plaintiff's actions were not undertaken at the request of BT nor with any expectation on the part of BT that it would pay Arzoonamian. In late April 2002, plaintiff interjected himself into a potential telecommunications transaction between Unilever and BT. As noted above, that deal was rejected by Unilever. Arzoomanian acted on his own initiative and at his own risk.

He was involved for less than two weeks and much of BT's time was spent debunking Arzoomanian's representations. There was no acceptance by BT.

Moreover, *quantum meruit* is an equitable remedy. A petitioner in equity must come to the court with "clean hands," and the petitioner's wrongful or illegal conduct may dissuade a court from granting equitable relief on an otherwise meritorious claim. *Lewis v. Attorney General of United States*, 878 F.2d 714, 723 (3d Cir. 1989). Ordinarily, the wrong invoked under the clean hands maxim to defeat a suit must stand in direct and immediate relation to the equity which the petitioner seeks to enforce. *Id.* (citing DeFuniak, Handbook on Modern Equity, at § 24, p. 39 (1956) (petitioner may not receive equitable relief if he has been guilty of any inequitable or wrongful conduct with respect to the "transaction or subject matter sued on")). It is undisputed that Arzoomanian misled BT. Most importantly, Arzoomanian contended (a) that he had board level contacts at Unilever; (b) he had a contract with Unilever to represent Unilever in the negotiations; and (c) that BT must deal through him or suffer the repercussions, all of which are untrue. One who seeks equity must do equity. *Miller v. Beneficial Management Corp.*, 855 F.Supp. 691, 712 (D.N.J. 1994)(citing *Manufacturer's Finance Co. v. McKey*, 294 U.S. 442, 449, 55 S.Ct. 444, 447, 79 L.Ed. 982 (1935)). In this case, an equitable remedy is unavailable to Arzoomanian due to his unclean hands.

## VI.

Plaintiff offers the "expert" report of Terrence P. McGarty. It adds little substance to plaintiff's claim. Mr. McGarty's statements are beyond the facts in this case. For example, there is no explanation of what constitutes ordinary or customary compensation in the alleged deal with Arzoomanian. As a matter of fact, the report, if carefully scrutinized, may actually support the

28

defendants.

The report describes the role of an Intermediary. An Intermediary is one who "can bring together individuals into mutual contact in ways that may not be accomplished without his unique capabilities." (Report of Terrence P. McGarty ("McGarty Report"), dated March 14, 2006, p. 7, ¶ 2.1.2.). One assertion of Arzoomanian was that he had board level contact, which admittedly BT did not possess. However, the expert fails to acknowledge that Arzoomanian did not have such relationships; and accordingly, no unique capabilities.

In another section of the expert report, it states that an intermediate and the other party have "an amicable agreement to compensate the Intermediary." (*Id.*, p. 7, ¶ 2.1.3.). As stated previously in this opinion, there is no implicit agreement here. According to Arzoomanian, there was no amicable agreement between the parties. Simply stated, Unilever allegedly expected plaintiff's compensation to come from BT. As memorialized in a Maras e-mail to Disley and Kitchen, "This means that in order to do business with Unilever, we have to pay Mark's group." However, there are several e-mails in which BT contemplates, that if Arzoomanian possesses the authority to bind Unilever, then BT would discuss with Unilever the terms of compensation to be paid Arzoonamian.

The expert report contends that usually "Intermediaries are well known entities..." (*Id.*, p. 7, ¶ 2.2.1.). As is evident from the wealth of e-mails between May 4 and May 10, 2002, none of this deal's decision makers in the United Kingdom knew Arzoomanian or what authority he had, if any. Arzoomanian was not "well known" as a broker in the industry.

The report discusses the usual compensation process. "The Intermediary is almost always compensated from the party obtaining the revenue in the resulting deal. Specifically, if I used an Intermediary, I would be doing so to obtain a contract for my company. Therefore, I would be

obtaining the revenue and the responsibility for the Intermediary's compensation would be generally my responsibility." (*Id.*, p. 8, ¶ 2.2.4.). The report is correct; but it undermines rather than supports plaintiff's claims. Arzoomanian alleges that Unilever authorized him to find a telecom provider; and therefore Unilever was using the Intermediary. The usual circumstances of which the expert speaks did not occur in this case.

Although the expert report opines that by sending the SOI., BT demonstrated a commonly understood acceptance by BT of the services of the Intermediary (*Id.*, p. 9, ¶2.3.5.), the SOI makes no mention of plaintiff or any third party. The expert opinion ignores this fact. In every discussion regarding the SOI and LOI, BT personnel question the veracity of plaintiff's claim that he has authority to act on behalf of Unilever.

Finally, McGarty opines that the compensating party such as BT had an obligation to advise the Intermediary when he first approached that it did not wish to engage his services. This does not hold water here because Arzoomanian misled BT about certain facts, and BT acted promptly to determine Arzoomanian's status with Unilever once Arzoomanian disclosed that he believed BT was obligated to pay. In conclusion, the expert opinion appears contrary to the facts of the case. It cannot be given much weight.

## VII.

Allowing this case to go forward would, in effect, turn contract law upside down. At oral argument, plaintiff's counsel was afforded the opportunity to address the precedential impact on the case if summary judgment were not granted; but counsel failed to adequately answer the Court's inquiry. To deny summary judgment, despite the relatively clear record, would be a license for

aggressive entrepreneurs to assert a broker relationship in a myriad of cases.  In truth, Arzoomanian

is an entrepreneur who undertook a risky proposition.  The better policy is to foster basic contract

law, and promote firm contractual relationships.  Plaintiffs, like Arzoomanian, should negotiate at

least basic terms of a contract up front, before any work is performed.

January 11, 2006                                     PETER G. SHERIDAN, U.S.D.J.

31